IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

YSIEM CORPORATION,

Plaintiff,

v.                                    CIVIL NO. 98-2387(JAG)

COMMERCIAL NET LEASE REALTY, INC.,
OFFICE MAX, INC.

Defendants.

## REPORT AND RECOMMENDATION

The present action is before this Magistrate-Judge pursuant to the referral by the court of pending motions for report and recommendation. (D.E. #11)

On March 3, 2000, plaintiff Ysiem Corporation ("Ysiem") moved for partial summary judgment on the issue of liability (Docket # 17), and defendant Commercial Net Lease Realty, Inc. ("CNLR") moved for summary judgment to dismiss the complaint (Docket # 19).[1]  CNLR opposed Ysiem's motion for partial summary judgment (Docket # 24), and Ysiem did likewise with respect to CNLR's motion for summary judgment (Docket # 25).

Thus, the Court has before it cross-motions for summary judgment, and as the parties acknowledged, the central issue in both motions is one of law. [Docket # 26].

---

[1]  The cross-motions for summary judgment were simultaneously filed pursuant to the Court's Scheduling Order dated September 1, 1999, which set a deadline of March 3, 2000, for such dispositive motions. [Docket # 14].



Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 2

## I. BACKGROUND

This case concerns a proposed tri-party transaction whereby CNLR was going to ground lease a vacant parcel of land owned by Ysiem in Río Piedras, Puerto Rico, build in it a typical Office Max free-standing building, and then lease it to Office Max for a term of twenty (20) years. The first phase of the transaction was basically completed, inasmuch as CNLR and Ysiem agreed on the basic economic terms of the proposed ground lease agreement. The second phase of the transaction, however, did not materialize as Office Max did not show any interest in the proposed building.

As a result of Office Max's disinterest in the proposal, the proposed transaction failed and this lawsuit followed. The complaint basically alleges that CNLR acted in concert with Office Max to structure a ground lease agreement on a certain parcel of land owned by Ysiem, in which lease arrangement Ysiem was going to be the landlord, CNLR the tenant, and Office Max the sub-tenant. Ysiem claims the ground lease agreement with CNLR is enforceable, and that CNLR and Office Max have failed to comply with it. As a result, Ysiem seeks $7,552,340 in damages for breach of contract. Ysiem also sought injunctive relief, but the court denied this request by a margin order dated July 21, 1999.

CNLR and Office Max denied the material averments of the complaint, and challenged the enforceability of the proposed ground lease agreement. The parties then proceeded to undertake discovery, after which Ysiem moved to voluntarily

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 3

dismiss its complaint against Office Max.  Partial judgment was entered on March 9, 2000, after which CNLR remained as the only defendant in this case.  (Docket # 23).

On December 11, 2001, a settlement conference was held before this Magistrate Judge, at which time the parties argued their respective positions in support of their contentions.  However, the parties were unable to bridged their differences and settlement was unavailing.

## II. THE SUMMARY JUDGMENT

The summary judgment record in this case is composed of the pleadings, deposition testimonies, answers to interrogatories, and documents.  The parties concede the documents are what they purport to be, for which reason they may be considered by the court.  Cerqueira v. Cerqueira, 828 F.2d 863, 865 (1st Cir. 1987) (citing Celotex v. Catret, 477 U.S. 317, 106 S.Ct. 2548 (1986)).  Both parties filed their own versions of the uncontested facts.  See Local Rule 311.12.  From these sources, the relevant facts are as follows:

1.  Ysiem Corporation is a domestic corporation organized and existing under the laws of the Commonwealth of Puerto Rico.  Ms. Meisy Pérez ("Pérez") is a duly authorized official of Ysiem.

2.  Ysiem owns a parcel of approximately 2.12 acres of unimproved land, located at the Northeast corner of 65th Infantry Avenue and Paganini Street in Rio Piedras, Puerto Rico ("Property").

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 4

3.    Commercial Net Lease Realty, Inc. is a corporation organized and existing under the laws of the State of Maryland and has its principal place of business in Orlando, Florida.  Mr. John Michael Davis ("Davis") is Vice President of Real Estate at CNLR's build-to-suit division.  Davis' Dep. at 11.

4. CNLR owns real estate, freestanding real estate in 35 states.  It has total assets of about $600 million and trades in the New York Stock Exchange.  Basically, CNLR acquires property in either of two ways:  it buys existing buildings from developers, or buys vacant lots and constructs in them build-to-suit projects.  Id., at 12.  In either case, it is the policy of CNLR not to close on a piece of property unless it has a lease commitment with a tenant, or a sub-tenant in the case of a ground lease.  Id., at 15.

5.  There is no contractual relationship between CNLR and Office Max with respect to site selection.  Essentially, CNLR is an arm's length third-party developer who submits sites to Office Max to see if they would consider leasing them.  Id., at 23.

6. Mr. Joseph A. Mannino ("Mannino") is a real estate broker with Trammell Crow (formerly Doppelt & Co.), Office Max's real estate broker.  Mannino's work entails representing retail chains in their quest for site selection.  Mannino submits sites to Office Max as a broker.  Id., at 21.

7.    Mannino acts as a middleman.    Basically, he is charged with the responsibility of going out and preliminarily selecting a site for Office Max that he

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 5

1

2    thinks they may consider, based on the criteria that he understands to be their site

3    criteria.  Once Mannino feels that a particular site needs to be considered by Office

4
Max, he brings the package of information to Office Max and shows them the site
5
6    location on a map.  Mannino's Dep. at 21.

7          8.   Mr. Carlos Rotger ("Rotger") is a real estate broker in Puerto Rico and

8    also works for Trammell Crow.

9          9.   Early in 1998, Rotger brought to Davis's attention  the Ysiem Property.
10
Id., at 23-24.  In doing so, Rotger did not represent to Davis that he was working in
11
12   the capacity as a broker for Office Max, but indicated to Davis that Office Max

13   would be a prospect for this site.  Id., at 25.

14         10.   After Rotger's initial approach, Davis made arrangement to travel to
15
Puerto Rico to review the site, to see where the Ysiem Property was located.  Davis
16
17   did not talk with anyone at Office Max or Trammell Crow prior to his visit to Puerto

18   Rico.  Id., at 27.

19         11.   Davis drove by the site with Rotger.  Prior to the on-site inspection,

20   Rotger had submitted information to Davis on the Ysiem Property.  In that regards,

21   Rotger provided a package to Davis containing an aerial photograph, a map, and

22
an existing site plan showing the Pep Boys building and the vacant property next to
23
24   it.  Id., at 29.

25         12.   Based upon Rotger's existing site plant and prior to coming to Puerto

26   Rico, Davis caused CNLR to commission the drawing of a very preliminary site plan

to see if an Office Max building would fit on the Ysiem Property.  This conceptual

site plan was prepared in March 1998.  Mannino's Dep., at 29-30.  See, also,

Ysiem's Statement of Uncontroverted Facts, Attachment 6.

13.  CNLR did not contact or require any authorization from Office Max with

regards to the conceptual site plan.  It is very standard in the industry for

developers to have floor plans or footprints of various retail boxes, so a developer

can take any tenant and pretty much put it on a conceptual site plan such as the

one in this case.  Davis' Dep. at 31.  The purpose of the preliminary site plan is to

determine whether what Office Max typically occupies or a tenant like Office Max

typically occupies would fit on the site.  Id., at 34.  See, also, Ysiem's Statement of

Uncontroverted Facts, Attachment 7.

14.  In early March 1998, during his trip to Puerto Rico, Davis met with

Pérez.  Rotger had made the arrangements for the meeting with Ysiem.  Davis had

in mind that Office Max was a potential prospect for the site, and showed Pérez the

conceptual site plan with the Office Max retail box.  Id., at 37, 42.

15.  Pérez informed Davis that she was not willing to sell, but would entertain

a ground lease of the Property.  Davis said that he would consider it, although it

was not a typical deal for CNLR.  Davis then asked Pérez about the annual ground

rent, and found Pérez' offer too high.  Davis informed Pérez that the proposed rent

was too high for a build-to-suit development for a national retail tenant such as

Office Max.  Id., at 38.

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 7

16.  Davis and Pérez did not reach any preliminary agreement regarding the proposed ground lease.  They were just trying to get an understanding with respect to what the rent would be.  In sum, there was no understanding reached at this initial meeting as to what the essential terms would be if a ground lease were to be considered.  Id., at 38, 40, 43.

17.  On March 17, 1998, Davis submitted to Pérez a signed non-binding "Letter of Intent — Proposed Ground Lease" ("LOI") regarding CNLR's proposal for the Office Max development at the Ysiem Property.  Verified Complaint, Exhibit 1.

18.  The proposed non-binding LOI identified Ysiem as the Ground Lessor, CNLR as the Ground Lessee, and Office Max as the Sub-Tenant.  It proposed a term lease of twenty (20) years plus four to five-year options, and a specific annual ground rent for each period of time; a sub-lease to Office Max of 20 years plus 4-5 year options; and a commencement date for the ground lease of the earlier of: (1) six (6) months following construction commencement, or (2) Office Max's store opening, whichever shall first occur.  It also provided that following the commencement date, the Ground Lease shall be fully triple net (excluding Lessor's financing),[2] as if Ground Lease were the owner thereof.  Finally, the non-binding LOI provided at paragraph 14 the following language with respect to the final documentation of the proposed transaction:

_____

[2]    In a triple net lease the tenant pays the taxes, insurance and maintenance, in addition to its base rent.

AO 72
(Rev 8/82)

14. Final Documentation:

> The parties shall enter into negotiations for the completion of documentation incorporating the above. This transaction shall not be binding until final execution and delivery of such mutually agreeable documentation.

19. A letter of intent is a non-binding proposal which contains the terms and conditions that will ultimately be included in the proposed Ground Lease Agreement. To be binding, the proposal needs to be fully executed through a Ground Lease Agreement signed by both parties, in this case, CNLR and YSIEM. Mannino's Dep. at 72, 73.

20. CNLR did not discuss the proposed lease terms in the non-binding LOI with Office Max. It is an industry standard that prospective tenants, be it Office Max or anyone else, do not get involved in the negotiations of the land contract or the ground lease agreement. Davis' Dep. at 49-50, 52. As part of its business as a developer, CNLR does not engage in conversations with a tenant regarding the status of the underlying transaction, be it a ground lease or a purchase agreement. Id., at 67.

21. It is likewise an industry-wide practice for developers like CNLR to provide landowners with non-binding letters of intent in order to give them an understanding of what the terms of the proposed transaction will be. To enable the parties to get an understanding of where they think the rent could be. Id., at 43, 50, 51.

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 9

22.  Once the process of the non-binding LOI is completed, CNLR uses this information to prepare a pro-forma budget and submits it to the potential sub-lessee, in this case Office Max, together with a site plan, for its evaluation.  By this process, CNLR learns whether the site is feasible to Office Max or whether Office Max has any interest whatsoever on the site. Id., at 50-51, 55.

23.  A pro-forma budget is basically a development  budget which includes: land costs, architectural/engineering costs, construction costs, financing/carry costs and other soft costs.  Based upon this analysis, CNLR determines the rent it needs to charge the tenant or sub-lessee.  In this case, the rent it needs to charge Office Max on the proposed sub-lease.  Mannino's Dep. at 54.  The pro-forma budget is essentially the next stage after the non-binding LOI to see if the prospective tenant is interested in leasing space at the proposed site.  Davis' Dep. at 68.

24.  Pérez and Davis discussed the proposed non-binding LOI, made certain modifications to it, and signed it on March 26, 1998.   Ysiem's Statement of Uncontested Facts, Attachment 8; Verified Complaint, ¶ 12, Exhibit 2.

25.  On April 17, 1998, CNLR submitted to Ysiem a black-lined copy of the proposed ground lease agreement showing changes made from the Pep Boys Agreement.  Verified Complaint, ¶ 13, Exhibit 3.  Thereafter, during April and May, Ysiem and CNLR exchanged drafts which reflected the modifications each suggested to the proposed ground lease agreement.  Verified Complaint, ¶ 14.

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 10

1

2       26.  Davis requested that clause 7.6 be added to the proposed ground lease

3       agreement.  This clause afforded CNLR the time it needed to prepare a pro-forma

4       budget for Office Max which would be a presentation of what the underlying ground

5       rent would be proposed for this transaction, plus a cap rate or return on investment

6       of 11% based upon CNLR's building costs.  Davis' Dep. at 65.  The cap rate is the

7       rate of return that CNLR expects to earn on its investment in the land and building.

8       Id., at 83.

9

10      27.   On or about May 6, 1998, CNLR forwarded to Ysiem four (4)

11      unexecuted originals of the proposed Ground Lease Agreement and requested that

12      Ysiem would have a duly authorized corporate official execute all four (4) originals

13      before a Notary Public and to return the originals for execution to CNLR.  Verified

14      Complaint, at ¶ 16, Exhibit 4.

15      28.  Clause 7.6 of the Ground Lease Agreement provides as follows:

16          7.6  Tenant's Sublease Condition.

17          Within sixty (60) days of the Effective Date, Tenant shall
            have obtained a sublease with Office Max, Inc., an Ohio
18          corporation ("Office Max"), in a form satisfactory to
            Tenant in its sole and absolute discretion.  If Tenant
19          does not obtain the sublease within such 60-day period,
            Tenant, at Tenant's option, by written notice to Landlord
20          within five (5) days after the expiration of such 60-day
            period, may terminate this Lease.  If Tenant does not
21          give the aforesaid notice to Landlord prior to the
            expiration of the applicable 5-day period, Tenant shall
22          be deemed to have waived this condition.  If Tenant
            terminates this Lease under this Section 7.6, this Lease

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 11

               shall become null and void, and neither party shall have
               any further obligations hereunder.

29.  The Ground Lease Agreement defines "Effective Date" as the date in which the Ground Lease Agreement is made and entered into.  The preamble reads as follows: "THIS GROUND LEASE AGREEMENT is made, entered into and effective as of the ____ day of _____, 1998, (the "Effective Date") by and between YSIEM CORPORATION, a Puerto Rico corporation ("Landlord"), and COMMERCIAL NET LEASE REALTY, INC., a Maryland corporation ("Tenant")."

30.  The Effective Date is when both parties sign the Ground Lease Agreement, and that goes back to paragraph 14 of the non-binding LOI.  The Ground Lease Agreement is not effective until both parties have signed it.  Davis' Dep. at 66, 97.

31.  Regarding the sub-lease of the Property, clause 12.2 of the proposed Ground Lease Agreement provides that: "Landlord acknowledges that Tenant intends to sublease the Premises to Office Max for the purpose of an operation of an Office Supply Center."

32.  On or about May 12, 1998, Ysiem executed the four (4) originals of the Ground Lease Agreement, and returned the signed originals to CNLR for its corresponding execution. Verified Complaint, at ¶ 17, Exhibit 5.  On May 13, 1998, CNLR received the copies of the Ground Lease Agreement.  Ysiem's Statement of Uncontested Facts, Attachment 12.

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 12

33. Based upon the information in the proposed Ground Lease Agreement, Davis prepared the pro-forma budget for submission to Office Max to see if Office Max would be interested in leasing space at this location. Davis' Dep. at 68, 88.

34. On June 29, 1998, Davis faxed Mannino the pro-forma budget for the Office Max sub-lease, as well as a site plan. Ysiem's Statement of Uncontroverted Facts, at ¶ 26. The pro-forma budget offered Office Max an annual rent of $542,569 or approximately $23.09 per square feet for the first five (5) years of the sub-lease. The annual rent for the 20 years sub-lease was as follows:

| | Annual Rent | Building Rent | Ground Rent | | |
|---|---|---|---|---|---|
| Years 1-5 | $347,057 | $195,512 | $542,569 | $23.09 |
| Years 6-10 | $364,410 | $217,417 | $581,827 | $24.76 |
| Years 11-15 | $382,630 | $238,323 | $620,953 | $26.42 |
| Years 16-20 | $401,762 | $259,228 | $660,990 | $28.13 |

The pro-forma budget to Office Max included a cap rate of 11%, and after Years 1-5, the annual rent increased by 5% in each of the following three (3) successive five-year periods. CNLR's Statement of Uncontested Material Facts, ¶ 39, Exhibit 7.

35. Mannino's initial reaction to the pro-forma budget was generally negative. He found the proposed rent too high, and he did not feel that it was going to work for Office Max. Davis's Dep. at 71-72, 73-74; Mannino's Dep. at 53.

AO 72
(Rev 8/82)

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 13

36. After Mannino's rejection, Davis examined again the numbers of the pro-forma budget to see if there was any way to get the rent down. Davis specifically explained to Pérez that he could not sign the sub-lease with Office Max because the ground lease rent did not work, it had to be lowered. Davis asked Pérez to change the proposed Ground Lease Agreement to lower the ground rent by $2.00 a foot, but it was rejected. Unable to lower the hard and soft cost, David took the step of lowering its own cap rate from 11% to 10.5% in an effort to try to get something that would work for Office Max. Davis' Dep. at 72, 77, 88, 98, 99, 102; Mannino's Dep. at 79.

37. Davis submitted a second pro-forma budget to Mannino with an annual rent for Years 1-5 of $526,793 or approximately $22.42 per square feet. In this pro-forma, CNLR reduced both its cap rate from 11% to 10.5%, and the annual increases in the sub-lease rent from 5% to 3% in Years 6-10, and from 5% to 4% for Years 11-15 and 16-20. CNLR's Statement of Uncontested Material Facts, ¶ 37, Exhibit 8.

38. This reduction in the projected rent increases had a similar effect as the cap rate reduction, inasmuch as it meant that CNLR would obtain reduced profits. Davis' Dep. at 91.

39. Notwithstanding these concessions, which CNLR considered significant, Mannino still found the proposed annual rent for the sub-lease rent too high; they

AO 72
(Rev 8/82)

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 14

1

2    were still far off; the second pro-forma budget was still too far out.  Davis' Dep. at

3    74-75, 90.

4

5        40.  On July 13, 1998, Rotger sent a letter to Mannino explaining to him the

6    reasons why the proposed rent for the Office Max sub-lease was not too high.  In

7    his letter, Rotger informed Mannino that Ysiem had instructed its broker to proceed

8    to find another user for the Property.  Davis' Dep. at 92; Ysiem's Statement of

9    Uncontroverted Facts, at ¶ 28, Attachment 18.

10

11       41.  On July 27, 1998, as a last ditch effort to interest Office Max in the

12   Property as a sub-tenant, Davis sent directly to Mr. Mark L. Keschl at Office Max a

13   non-binding letter of intent regarding the economics terms of the proposed sub-

14   lease.  Ysiem's Statement of Uncontroverted Facts, at ¶ 29; CNLR's Statement of

15   Uncontested Material Facts at ¶ 41, Exhibit 9; Davis's Dep. at 91, 93, 103-104.

16       42.  After this last ditch effort with Office Max proved unsuccessful, Davis

17   notified Pérez within one or two weeks thereafter that CNLR could not go forward

18   with the proposed transaction.  Id. at 103-104.

19

20       43.  Davis specifically informed Pérez that the reason why Office Max was

21   not willing to step up and sublease the Property was that the rent was too high, that

22   it just was not within the range for them.  Davis' Dep. at 99, 101.

23

24       44.  All transactions must be submitted and approved by the Real Estate

25   Executive Investment Committee ("REIC") of CNLR.  The proposed Ground Lease

26

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 15

Agreement never reached REIC because it was incomplete without Office Max. Id., at 82-84.

45.  On August 26, 1998, Ysiem's counsel wrote to CNLR's counsel inquiring about CNLR's execution of the proposed Ground Lease Agreement.  Verified Complaint at ¶ 19, Exhibit 6.

46.  On August 26, 1998, the four original copies of the proposed Ground Lease Agreement were returned to Pérez, which copies had not been executed by CNLR.  Verified Complaint at ¶ 20, Exhibit 7.

47.  On September 4, 1998, CNLR's counsel responded to the queries raised by Ysiem's counsel in his letter of August 26, and explained that since CNLR never signed the proposed Ground Lease Agreement, there was never an effective contract pursuant to paragraph 14 of the non-binding LOI.  With implied reference to clause 7.6 of the proposed Ground Lease Agreement, the letter adds that since Office Max informed CNLR that it did not have an interest in sub-leasing the site, it would have been illogical for CNLR to execute the proposed Ground Lease Agreement and then immediately terminate it.  Verified Complaint at ¶ 21, Exhibit 8.

48.  On December 10, 1998, Ysiem filed the instant action.

## III. STANDARD OF REVIEW

The summary judgment jurisprudence is well known, and an outline suffices here.   Summary judgment is proper only to the extent that "the pleadings,

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 16

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A court must pierce the boilerplate of the pleadings and carefully review the parties submissions to ascertain whether they reveal a trialworthy issue as to any material fact. Pérez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001); Rivera-Cotto v. Rivera, 38 F.3d 611, 613 (1st Cir. 1994); Snow v. Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1994).

Although the accepted summary judgment protocol calls for the court to cast the facts in the light most complimentary to the non-moving party's position, consistent with record support, the court may temper that protocol "to the extent that we set off, as point and counterpoint, conflicting evidence where the clash helps to illuminate pertinent legal issues." Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 185 (1st Cir. 1997).

"Summary judgment is an appropriate vehicle for resolving contract-interpretation disputes when the contract language is not infected by some material ambiguity." Elliot v. S.D. Warren Co., 134 F.3d 1, 9 (1st Cir. 1998). In general, "a contract can be interpreted by the court on summary judgment if (a) the contract's terms are clear, or (b) the evidence supports only one construction of the controverted provision, notwithstanding some ambiguity." Torres Vargas v.

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 17

Santiago Cummings, 149 F.3d 29, 33 (1st Cir. 1998). "The question whether a contract term is ambiguous is one of law for the judge." Elliot, 134 F.3d at 9.

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Intern. Group v. Ferre Development, 241 F.3d 103, 107 (1st Cir. 2001). "When deciding cross-motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997). "As always, we resolve all factual dispute and any competing, rational inferences in the light most favorable to the party against whom summary judgment has entered." Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996).

## IV. DISCUSSION

In its motion for partial summary judgment, Ysiem claims that based on the admissible and uncontroverted deposition testimony, the issue as to CNLR's liability is ripe for summary disposition.

The gravamen of Ysiem's argument is that the proposed Ground Lease Agreement in this case was duly perfected and it is therefore binding on the parties. In support of this contention, Ysiem narrates the sequence of events leading up to the non-binding LOI, and its subsequent execution of the proposed Ground Lease

AO 72
(Rev 8/82)

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 18

Agreement on May 12, 1998.  Ysiem then uses this factual background to couch the following question:  "Was the Ground Lease Agreement duly executed by Ysiem on May 12, 1998, a contractually perfected obligation between the parties or not?  Ysiem's "Memorandum in Support of Motion For Partial Summary Judgment" ("Memorandum") at 6.  See, also, "Plaintiff's Opposition to Defendant's Motion for Summary Judgment" at 1.

The answer to this question requires an examination of the proposed transaction.  It is undisputed that Office Max was the linchpin of the proposed transaction.  From the outset, Office Max was the target of the sub-lease in the proposed Ground Lease Agreement.  The non-binding LOI specifically made reference to Office Max as the sub-lessee.  It also anchored the commencement date of the proposed Ground Lease Agreement on the opening of the Office Max store.

The proposed Ground Lease Agreement also made clear the intention of the parties: "Landlord acknowledges that Tenant intends to sublease the Premises to Office Max for the purpose of an operation of an Office Max Supply Store."  Ysiem also knew that Office Max was the goal of the proposed transaction.  "From the representations made by CNLR, defendant's clear goal in entering into the Ground Lease Agreement was to be able to obtain a sub-lease of the subject premises from Office Max."  Memorandum, at 12.

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 19

The summary judgment record in this case shows that after Ysiem executed the proposed Ground Lease Agreement on May 12, 1998, CNLR prepared the pro-forma budget for the proposed sub-lease with Office Max and submitted it to Mannino on June 29, 1998. Mannino found the proposed rent too high, and Davis apprised Pérez of this situation. Davis explained to Pérez that Office Max found the rent too high, and asked Pérez for a reduction in the ground rent to make the sub-lease with Office Max work. Pérez turned down the request.

Davis next cut his own cap rate or return on investment, as well as the projected rent increases in order to lower the sub-lease rent, but such efforts proved insufficient to sway Office Max. On July 13, Rotger tried to resurrect the transaction, but to no avail. Rotger even warned Mannino that Ysiem had instructed its broker to look for another user. As a last ditch effort to salvage the proposed transaction, Davis submitted directly to Office Max a non-binding letter of intent on July 27, 1998, but that also proved unsuccessful. Without Office Max, the proposed transaction collapsed to the detriment of both Ysiem and CNLR.

Notwithstanding this background, Ysiem argues that "once a meeting of the minds has been accomplished, an offer is made and accepted, we are in the presence of a valid, binding contract." Hence, Ysiem argues that "CNLR was bound by the terms and conditions of the Ground Lease Agreement from the time it received the executed lease" on May 13, 1998. Memorandum, at 11. This argument proves too much.

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 20

Under Puerto Rico law, "the contracting parties may make the agreement and establish the clauses and conditions which they may deem advisable, provided they are not in contravention of law, morals, or public order." 31 L.P.R.A. § 3372. Article 1233 of the Puerto Rico Civil Code provides that when "the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed." 31 L.P.R.A. § 3471.

A term is considered "clear" when it is sufficiently lucid to be understood to have one particular meeting, without room for doubt. Hopgood v. Merrill Lynch, Pierce, Fenner & Smith, 839 F.Supp. 98, 104 (D.P.R. 1993), aff'd., 36 F.3d 1089 (1st. Cir. 1994). If the meaning of a contract term is sufficiently clear, "the court cannot dwell on the 'alleged' intent of the parties at the time they entered into the contract." Vulcan Tools of Puerto Rico v. Makita U.S.A., Inc., 23 F.3d 564, 567 (1st Cir. 1994).

In the instant case, the non-binding LOI established that

> The parties shall enter into negotiations for the completion of documentation incorporating the above. This transaction shall not be binding until final execution and delivery of such mutually agreeable documentation.

The negotiations contemplated in the proposed transaction not only included the completion of documentation regarding the ground lease agreement with Ysiem, but also the sub-lease with Office Max. Although the documentation with Ysiem was basically completed; nevertheless, the documentation with Office Max

was never materialized because Office Max did not accept the proposed sub-lease agreement.  Without the final execution and delivery of such mutually agreeable documentation with respect to the ground lease and sub-lease, the proposed transaction was not binding by stipulation of the parties.

Ysiem argues that CNLR failed to timely invoke clause 7.6 of the Ground Lease Agreement, which would have allowed CNLR to terminate the ground lease if it did not obtain a sub-lease with Office Max within 60 days of the Effective Date of the Ground Lease Agreement.[3]  Memorandum, at 5.  The problem with this argument is that the Effective Date required both CNLR and Ysiem to execute the proposed Ground Lease Agreement, and here only Ysiem signed the ground lease.

Ysiem further argues that "CNLR also surreptitiously and unilaterally decided to attempt to postpone the effectiveness of the contract by not formally executing the Ground Lease Agreement."  Memorandum, at 15.  The record does not support this argument.  The record here shows that after Davis submitted the pro-forma budget to Mannino for the proposed sub-lease with Office Max, Mannino found the proposed sub-lease rent too high.  In June 1998, Davis informed Pérez of this difficulty with Office Max, and asked Pérez to lower the ground lease rent, but she refused.  Ysiem was fully aware of the situation with Office Max, and under these

---

[3]    According to Ysiem, the proposed Ground Lease Agreement became effective when CNLR received it on May 13, 1998.  Clause 7.6 requires written notice to Landlord within five (5) days after the expiration of the 60-day period.  Thus, the 65 day period of time for CNLR to terminate the ground lease expired on July 16, 1998.

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 22

circumstances, it would have been a superfluous act for CNLR to execute the proposed Ground Lease Agreement, trigger the 65-day period in clause 7.6, and then terminate it.    On the other hand, absent a legally valid Ground Lease Agreement, there was no need for CNLR to terminate an inexistent ground lease.

In sum, we hold that under the particular facts of this case, the Ground Lease Agreement that Ysiem executed on May 12, 1998, pursuant to the non-binding LOI, is unenforceable inasmuch as its effectiveness was conditioned on it being executed by both parties.  We also hold that the transaction contemplated in this case required the parties to complete the documentation regarding the ground lease agreement and the sub-lease agreement.  Absent the final execution and delivery of such mutually agreeable documentation, the proposed transaction was not binding.

## V. CONCLUSION

In light of the above discussion, this Magistrate Judge recommends that CNLR's motion for summary judgment should be granted.  Ysiem's partial motion for summary judgment should be denied.

Under the provisions of Rule 510.2, Local Rules, District Court, the parties have ten (10) days to file any objections to this report and recommendation after being served with a copy thereof.  Failure to file objections within the specified time

AO 72
(Rev.8/82)

Report and Recommendation
Ysiem Corp v. Commercial Net Lease Realty
Civil No. 98-2387(JAG)
Page 23

waives the right to appeal this order. <u>Henley Drilling Co. v. McGee</u>, 36 F.3d 143,

150-151 (1st Cir. 1994); <u>United States v. Valencia</u>, 792 F.2d 4 (1st Cir. 1986).

**IT IS SO RECOMMENDED**.

In San Juan, Puerto Rico, this 3rd day of January, 2002.

J. ANTONIO CASTELLANOS
United States Magistrate Judge