IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

YSIEM CORPORATION

    Plaintiff

v.

COMMERCIAL NET LEASE REALTY, INC.

    Defendant

CIVIL NO. 98-2387 (JAG)



**OPINION AND ORDER**

GARCIA-GREGORY, D.J.[1]

Pending before the Court are the objections filed by plaintiff Ysiem Corp. ("Ysiem") to the Report and Recommendation submitted by United States Magistrate-Judge Jesus A. Castellanos on the motion for summary judgment filed by defendant Commercial Net Lease Realty Inc., ("CNLR"). (Docket No. 19). Magistrate-Judge Castellanos recommended that the Court **GRANT** summary judgment. After reviewing the objections, the Court **ADOPTS** the Report and Recommendation. (Docket No. 52).

**STANDARD OF REVIEW**

A district court may, on its own motion, refer a pending matter to a United States Magistrate-Judge for a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b); Local

---

    [1] Britt E. Arrieta-Rivera, a second year student at University of Puerto Rico Law School, assisted in the research and preparation of this opinion.





AO 72A
(Rev. 8/82)

Civil No. 98-2387 (JAG)                                                              2

Rule 503. The losing party may contest the Report and Recommendation by filing written objections within ten days of being served with a copy of the Report and Recommendation. The Court must then make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made. The Court may accept, reject or modify, in whole or in part, the magistrate's recommendations. "Failure to raise objections to the Report and Recommendation waives that party's right to review in the district court and those claims not preserved by such objection are waived on appeal." <u>Davet v. Maccarone</u>, 973 F.2d 22, 30-31 (1st Cir.1992).

### PROCEDURAL BACKGROUND

On December 10, 1998, Ysiem brought suit against CNLR and Office Max for breach of contract (ground lease agreement). After discovery, Ysiem voluntarily moved to dismiss the claim against Office Max and partial judgment was entered. (<u>See</u> Docket 23). On March 3, 2000 Ysiem filed a motion for partial summary judgment on the issue of liability arguing that the ground lease agreement with CNLR should be enforced because it contained all the necessary elements of a valid contract under Puerto Rico law. (<u>See</u> Docket 17). On the same day, CNLR filed a motion for summary judgment to dismiss the complaint. Both parties opposed both motions, (<u>see</u> Docket 24; Docket 25); and acknowledged that the central issue in this case is one of law. ( <u>See</u> Docket 26). The case was then

Civil No. 98-2387 (JAG)                                                    3

referred to Magistrate-Judge Jesus A. Castellanos who, on December 11, 2001, held a settlement conference to no avail. (See Docket 51). On January 4, 2002 the Magistrate-Judge filed a Report and Recommendation. (See Docket 52). Subsequently, Ysiem filed objections to the Magistrate-Judge's findings; (see Docket 55); and CNLR responded. (See Docket 56).

### FACTUAL BACKGROUND[2]

On March 17, 1998, CNLR submitted to Ysiem a signed nonbinding "Letter of Intent" ("LOI") regarding CNLR's proposal for a tri-party transaction in which Ysiem was going to ground lease a parcel of land to CNLR, who would then sub-lease it to Office Max for a term of 20 years. (Docket 52, Report and Recommendation at 2.) Ysiem and CNLR signed the proposed non-binding LOI on March 26, 1998. (Ysiem's Statement of Uncontested Facts, Attachment 8.)

On April 17, 1998, CNLR submitted to Ysiem a black-lined copy of the proposed ground lease agreement. (Verified Complaint at 13.) During April and May, Ysiem and CNLR exchanged drafts which reflected the modifications each suggested to the proposed ground lease agreement. (Verified Complaint at 14.) On May 6, 1998, CNLR forwarded to Ysiem four (4) unexecuted originals of the proposed Ground Lease Agreement and requested that Ysiem have a duly authorized corporate official execute all four (4) originals

---

[2] The facts are taken from the Magistrate-Judge's Report and Recommendation.

Civil No. 98-2387 (JAG)                                                    4

before a Notary Public and return the originals for execution to CNLR. (Verified Complaint at 16.) On May 12, 1998, Ysiem executed the four (4) originals of the Ground Lease Agreement, and returned the signed originals to CNLR for its corresponding execution. (Verified Complaint at 17.) On May 13, 1998, CNLR received the copies of the Ground Lease Agreement. (Ysiem's Statement of Uncontested Facts, Attachment 12.)

On June 29, 1998, CNLR faxed Office Max a pro-forma budget for the sub-lease, as well as a site plan. (Ysiem's Statement of Uncontroverted Facts, at 26.) Office Max considered the rent to be excessive and rejected the proposal. (Davis' Dep. at 71-72, 73-74.) CNLR informed Ysiem of Office Max's reaction and asked for a rent reduction, but Ysiem denied the request. (<u>Id.</u>) CNLR submitted a second pro-forma budget to Office Max where CNLR reduced its cap rate from 11% to 10.5%, and the annual increases in the sub-lease rent from 5% to 3% in Years 6-10, and from 5% to 4% for Years 11-15 and 16-20. (CNLR's Statement of Uncontested Material Facts, 91 37, Exhibit 8.) Office Max still found the proposed annual rent for the sub-lease rent too high. (Davis' Dep. at 74-75,90.)

On July 13, 1998, Ysiem sent a letter to Office Max setting forth the reasons why the proposed rent for the Office Max sublease was not too high. In its letter, Ysiem informed Office Max that Ysiem had instructed its broker to proceed to find another user for the Property. (Ysiem's Statement of Uncontroverted Facts, at 28,

Attachment 18.) On July 27, 1998, as a last ditch effort to interest Office Max in the Property as a sub-tenant, CNLR sent to Office Max a non-binding letter of intent regarding the economic terms of the proposed sublease. (Ysiem's Statement of Uncontroverted Facts, at 29; Davis' Dep. at 91, 93, 103-104.) After this effort with Office Max proved unsuccessful, CNLR notified Ysiem within two weeks thereafter that CNLR could not go forward with the proposed transaction. (Id. at 103-104.)

On August 26, 1998, Ysiem asked CNLR about CNLR's execution of the proposed Ground Lease Agreement. (Verified Complaint at 19.) On September 4, 1998, CNLR's informed Ysiem's that since CNLR never signed the proposed Ground Lease Agreement, there was never an effective contract pursuant to paragraph 14[3] of the LOI. With implied reference to clause 7.6[4] of the proposed Ground Lease

---

[3] Paragraph 14 of the LOI provides as follows:

> "The Parties shall enter into negotiations for the completion of documentation incorporating the above. This transaction shall not be binding until final execution and delievery of such mutually agreeable documentation."

[4] Clause 7.6 of the Ground Lease Agreement provides as follows:

> 7.6 <u>Tenant's Sublease Condition</u>.
>
> Within sixty (60) days of the Effective Date, Tenant shall have obtained a sublease with Office Max, Inc., an Ohio corporation ("Office Max") , in a form satisfactory to Tenant in its sole and absolute discretion. If Tenant does not obtain the sublease within such 60-day period, Tenant, at

Civil No. 98-2387 (JAG)                                                    6

Agreement, CNLR added that since Office Max informed CNLR that it did not have an interest in sub-leasing the site, it would have been illogical for CNLR to execute the proposed Ground Lease Agreement and then immediately terminate it. (Verified Complaint at 21.)

## DISCUSSION

Ysiem disputes the following findings of law of the Magistrate- Judge: a) that CNLR's and Ysiem's "ground lessor" and "land-owner" **relationship** was dependent on, and conditioned to, the sub-lease agreement between CNLR and Office Max; (Docket 55 at 5-24); b) that the **"effective date"** of the Ground Lease Agreement never took place; (Id. at 24-25); and, c) that under the circumstances it would have been a superfluous act for **CNLR** to **execute the proposed Agreement** and then terminate it according to the agreements's termination clause. (Id. at 25-26).

### I. The Relationship

Ysiem argues that upon receipt of the executed proposed agreement, CNLR was bound by its terms regardless of Office Max's

---

Tenant's option, by written notice to Landlord within five (5) days after the expiration of such 60-day period, may terminate this Lease. If Tenant does not give the aforesaid notice to Landlord prior to the expiration of the applicable 5-day period, Tenant shall be deemed to have waived this condition. If Tenant terminates this Lease under this Section 7.6, this Lease shall become null and void, and neither party shall have any further obligations hereunder.

Civil No. 98-2387 (JAG)                                                    7

participation. (Docket 52 at 19-20). After examining the record, however, the Magistrate-Judge found that, from the outset, the sub-lease to Office Max was the object of the proposed agreement. (Id. at 18). The Magistrate-Judge based his conclusion on the following facts:

    1.   On March 17, 1998, after prior negotiations, Mr. John Michael Davis ("Davis"), Vice-President of CNLR, sent Ms. Meisy Pérez ("Pérez"), Ysiem's duly authorized official, a signed non-binding Letter of Intent-Proposed Ground Lease Agreement ("LOI") which specifically identified Office Max as the sub-tenant. (Id. at 7).

    2.   The LOI stated that the commencement date of the proposed agreement would be either 6 months following construction commencement, or Office Max's store opening, whichever occurred first. (Id.).

    3.   The LOI further stipulated that the transaction would not be binding "until final execution and delivery of such mutually agreeable documentation." (Id.).

    4.   The proposed agreement clearly acknowledges the intention to sub-lease to Office Max. (Id. at 18).

    5.   Ysiem had acknowledged CNLR's clear goal to sub-lease to Office Max. (Id. at 18).

    6.   After Ysiem executed the proposed agreement, CNLR prepared a pro-forma budget and submitted it to Mr. Joseph A.

Civil No. 98-2387 (JAG)                                                                 8

Mannino ("Mannino"), a real estate broker with Trammel Crow, Office Max's real estate broker, who found the proposed rent too high. (Id. at 12, 19).

7. Davis specifically told Pérez that he could not sign the sub-lease with Office Max because the proposed lease rent needed to be lowered and asked for a reduction. Pérez turned down the request. (Id. at 13, 19).

8. Davis next cut his own cap rate and projected rent increase in order to lower the lease rent, yet Office Max refused to proceed with the transaction. (Id. at 19).

9. As a last effort to obtain Office Max's sub-lease, Davis sent Office Max a non-binding letter of intent which was also unsuccessful. (Id.)

Since Office Max did not accept the proposed sub-lease, the Magistrate concluded, Office Max's documentation was never received, thus, "the final execution and delivery of the mutually agreeable documentation with respect to the ground lease and sub-lease" did not "materialize". (Id. at 21). Accordingly, the "proposed transaction was not binding by stipulation of the parties". (Id. at 21).

Ysiem objects arguing that since Office Max was not involved in CNLR's negotiations, Paragraph 14 of the LOI "refers strictly to the completion, execution and delivery of the Ground Lease Agreement between CNLR and YSIEM." (Docket 55 at 23). Furthermore,

Civil No. 98-2387 (JAG)                                                      9

that the language contained in the proposed agreement is "drafted in broader and more general terms allowing for any other analogous sub-lease arrangements between CNLR and other unidentified third parties". (Id. at 6).

Paragraph 14 of the LOI stated: "The parties shall enter into negotiations for the completion of documentation incorporating the above. This transaction shall not be binding until final execution and delivery of such mutually agreeable documentation." ( Letter Of Intent, Docket 1, Exhibit 2 at 2). As discussed in the Report and Recommendation, under Puerto Rico law contracting parties are free to establish the clauses and conditions they deem advisable, "provided they are not in contravention of law, morals or public order." Article 1207, Puerto Rico Civil Code, 31 P.R. Laws Ann. §3372 (1990). When interpreting contracts in dispute, courts should turn to Article 1233 of the Civil Code, which provides that "[i]f the terms of the contract are clear and leave no doubt as to the intention of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail." 31 P.R. Laws Ann. §3471; see Borschow Hosp.& Med. Supplies, Inc., v. Castillo, 96 F.3d 10, 15 (1st Cir. 1996). See Velez Cajigas v. Order of St. Benedict, 115 F.Supp. 2d 246, 250 (D.P.R.2000). A term is clear "when it is sufficiently lucid to be understood to have one particular meaning, without room for doubt".

Civil No. 98-2387 (JAG)                                            10

Hopgood v. Merrill Lynch, Pierce, Fenner & Smith, 839 F.Supp. 98, 104 (D.P.R. 1993), *aff'd* 36 F.3d 1089 (1st Cir. 1994). See Vulcan Tools of P. R., v. Makita U.S.A., Inc., 23 F.3d 564, 567 (1st Cir. 1994). Once determined that the contract's terms are "sufficiently clear so that only one meaning is possible, the court cannot dwell on the 'alleged' intent of the parties at the time they entered into the contract." Hopgood, 839 F.Supp. at 104. See Borschow, 96 F.3d at 15; Vulcan, 23 F.3d at 567. See also Velez, 115 F.Supp. 2d at 250 (quoting Fernández-Fernández v. Municipality of Bayamón, 942 F.supp. 89, 94 (D.P.R.1996) "[t]he article is strict in its mandate that courts should enforce the literal sense of a written contract, unless the words are somehow contrary to the intent of the parties.").

We agree with the Magistrate-Judge's finding based on the clear language of the LOI that, without Office Max's execution and sub-lease documentation, the proposed transaction was not binding by stipulation of the parties. (Docket 52 at 20-21). Likewise, if we were to go beyond the language of the LOI and consider the parties' intention, the result would be the same. The facts distinctly show the parties' clear intent was to sub-lease to Office Max. In sum, as characterized by the Magistrate-Judge, Office Max "was the linchpin of the proposed transaction." (Docket 52 at 18). Ysiem has not presented evidence that proves the contrary.

Civil No. 98-2387 (JAG)                                                              11

## II. "Effective date" and execution.

The Magistrate-Judge found that since only Ysiem signed the proposed agreement, the "effective date", which required both parties to execute the same, did not take place. (Id.). Furthermore, that under the circumstances, it would have been a superfluous act for CNLR to execute the proposed Agreement and then terminate it according to the agreements's termination clause. (Id. at 25-26). The record supports this conclusion. The letter attached to the proposed agreement instructed Ysiem to sign the agreement and then return the executed copies to CNLR for execution. (Docket 1, Exhibit 4). Further yet, the proposed agreement's first paragraph states that the Ground Lease Agreement is executed "by and between" CNLR and Ysiem. CNLR did not sign the proposed agreement and the facts show CNLR intended to sign only after Ysiem had done so. CNLR's execution of the agreement depended upon Office Max's acceptance of the proposed rent. Because Office Max did not approve the proposed rent, it became meaningless for CNLR to sign the agreement. Contrary to plaintiff's argument, the facts clearly show that CNLR informed Ysiem of Office Max's refusal to enter into the sublease agreement because it found the proposed rent too high. CNLR asked Ysiem to lower the rent yet Ysiem refused to do so. Thus, since only Ysiem signed the proposed agreement, which required both parties to sign, the effective date did not take place.

Civil No. 98-2387 (JAG)                                                    12

    Ysiem argues, however, that CNLR could have simply terminated the agreement by means of a written notice pursuant to paragraph 7.6 of the proposed agreement which stated that if tenant did not "obtain the sublease within such 60-day period, Tenant, at Tenant's option, by written notice to Landlord within five(5) days after the expiration of such 60-day period, may terminate this Lease." (Docket 1, Exhibit 4, p. 10). We, however, agree with the Magistrate-Judge's conclusion that "absent a legally valid Ground Lease Agreement, there was no need for CNLR to terminate an inexistent ground lease." (Docket 52 at 22).

## CONCLUSION

    In sum, we agree with the Magistrate-Judge's findings and accordingly, in light of the foregoing, adopt the Report and Recommendation **GRANTING** CNLR's Motion for Summary Judgment. Judgment shall be entered accordingly.

    IT IS SO ORDERED.

    In San Juan, Puerto Rico, this 28th day of March 2002.

                                                  /s/ JAY A. GARCIA-GREGORY
                                                  United States District Judge